Claude R. Barco v. Commissioner.
Barco v. Commissioner
Docket No. 22151.
United States Tax Court
1953 Tax Ct. Memo LEXIS 279; 12 T.C.M. (CCH) 446; T.C.M. (RIA) 53142; April 24, 1953
*279 Held, the petitioner understated his income for 1943 and 1944 with intent to evade tax. Harry G. Taylor, Esq., for the petitioner. Thomas C. Cravens, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined deficiencies in income tax for 1943 and 1944 in the respective amounts of $7,563.80 and $9,231.50, and 50 per cent fraud penalties in the respective amounts of $3,781.90 and $4,615.75. At the hearing the petitioner conceded liability for the deficiencies in tax, but contests the assertion of the fraud penalties. The returns for the calendar years 1943 and 1944 were filed with the collector of internal revenue at Jacksonville, Florida. Findings of Fact The petitioner graduated from high school in 1918 and attended the University of Florida for about two and one-half years. He worked for Swift and Company in Jacksonville for over seven years, sold meats for Kingan and Company for four or five years, and for Jones-Chambliss Company for several years. He was a meat salesman for that company at the beginning of 1943. Due to meat rationing, the company then discontinued the employment of salesmen. *280 Prior to 1943 he operated a small retail grocery business as "Claude's Market". He sold this in 1942 for $3,000, repossessed it when the purchaser failed to make payments, and resold it in 1943. The second purchaser made payments of $50 per week until the price was paid. The petitioner opened another small business late in 1943, operated it for some two months, and sold it to his brother Nick for $3,000. Early in 1943 the petitioner commenced operation of a retail and wholesale meat business on Northwest 62nd Street in Miami. He operated this store until late in 1944 when he moved this business to Biscayne Boulevard, where he operated it until 1946. At that location he had a retail grocery business as well as retail and wholesale meats. In 1943 the petitioner's retail sales were rung up on a cash register. The register did not record sales on a tape but furnished a daily total of sales. The wholesale sales were made by the petitioner who kept the only record of them. His wife at that time, Hazel, compiled each week the daily cash register totals and the figures given her by the petitioner concerning wholesale sales. These figures were furnished to the petitioner's accountant, Ira *281 Billingham, or a bookkeeper employed by him. Buillingham was furnished the bank statement and cancelled checks each month. From these records he kept the books and prepared the petitioner's income tax returns. The petitioner used cash to pay his employees, pay many small bills, and make some purchases. His total receipts were not deposited in his bank account. During part of 1944 the bookkeeping figures were furnished by the petitioner to a Mrs. Ford, an employee of Billingham, for posting in the books. Mrs. Ford did the work at her home, the figures being furnished by the petitioner by telephone, or by written memoranda. In July 1944 the petitioner married again. After the petitioner moved his store to Biscayne Boulevard, later in 1944, his wife Agnes served as cashier at the new location. The cash register readings were taken by the petitioner or by Agnes, as one or the other would close the store at the end of the day. The petitioner and Agnes were divorced in 1947. In the petitioner's return for 1943 he reported salary of $298.93 from Jones-Chambliss Company and net profit of $6,633.73 from business. He reported net sales of $173,404.81 and gross profit of $19,449.31, expenses *282 $14,002.22 and net gain $5,447.09. After adding closing inventory and deducting depreciation, the return shows $6,633.73 as net profit. The petitioner's return for 1944 showed business receipts of $199,868.38, purchases $178,419.64, expenses $15,371.76, depreciation $921.10 and net profit of $5,155.88 from the business. It reported $203.54 as dividends or interest income. The petitioner's return for 1945 showed income from dividends or interest of $819.86 and profit from business as $25,366.47. The petitioner's income tax liability for 1943 and 1944 was investigated by revenue agents beginning September 13, 1945, and continuing to December 6, 1946. They were given a journal, and a general ledger, also some bank statements and cancelled checks which were not complete for any year. There were a few sales tickets or invoices, but not enough to verify sales figures for any year. They found it impossible accurately to determine the petitioner's income from the books. According to a statement prepared by Billingham and signed by the petitioner, the petitioner's net worth at the end of 1944 it was $41,678.32. By taking into account the increases in net worth and adding nondeductible *283 expenditures, the respondent's agents computed the petitioner's net income for 1943 to be $21,802.77 and for 1944 to be $23,102.62. The respondent's agents, by reference to the bank's records, reconciled the bank account and located all checks. By taking the total bank deposits, eliminating all items known not to be sales, and adding ascertained cash expended, such as for wages and some purchases, they computed the gross sales of the business and determined the correct net income. As so determined it was $22,786.45 for 1943 and $25,432.29 for 1944. The agents determined that petitioner's sales exceeded the sales reported on his returns by $15,897.13 in 1943 and $13,830.69 in 1944. The petitioner in 1943 paid and settled a claim for his violation of the Price Control Act as a result of an overcharge for meat. The petitioner substantially understated his income in his income tax returns for 1943 and 1944. A part of the deficiency for each year was due to fraud with intent to evade tax. Opinion The petitioner concedes the deficiencies in tax, but contests the penalties asserted. He does not admit that he understated his income, but says that he has lost his records, and therefore *284 is unable to maintain his burden of proving error in the respondent's determination of the tax deficiencies. He contends that if there was any failure to report income it was inadvertent or due to mistake and was not with intent to evade tax. The burden is therefore upon the respondent to prove that petitioner understated his income and that he did so with intent to evade tax. The respondent's agents were unable to reconcile the petitioner's tax returns for 1943 and 1944 with the records he produced in 1945. After comparing his statements of net worth and examining his banking transactions as recorded by the bank, they recomputed his income for the taxable years. Instead of an income of less than $7,000 for 1943 and $6,000 for 1944 they found income in excess of $21,000 for each year. The amounts computed under the method of analyzing bank deposits were approximately the same as the amounts found by consideration of the increases in the petitioner's net worth. The discrepancies between the amounts of income demonstrably received and the amounts reported is manifestly too large to give credence to the petitioner's assertion that the omissions to report income were due to inadvertence *285 or mistake. These amounts could not possibly have been overlooked. Such gross omissions are convincing evidence that the returns were fraudulent. , (C.A. 6, 1940); , affd. , certiorari denied . The petitioner's methods of record-keeping were such as to facilitate concealment of receipts and impede the verification of his accounts. The amounts of the wholesale transactions were known only to the petitioner. He gave some figures to the person keeping the books, but these were not capable of being verified, and large receipts could well have been omitted from the figures which he supplied. He was negligent in maintaining records and revenue agents could not reconcile his returns with his records. He was not ignorant or uneducated, he had attended the University of Florida for two and a half years and was evidently efficient in operating so successful a business. There is some indication that Billingham, who prepared the returns, could not satisfactorily determine the income from the books. Billingham was not produced as a *286 witness. The petitioner stated that he moved several times after 1945 and that his records were accidentally destroyed. It is noted that the revenue agents as early as in the fall of 1945 found the records then available were insufficient to permit verification of the returns. The petitioner has not supplied valid reasons for the discrepancies. He indicated that his brother sometimes gave him money to hold in the bank until needed and later received checks for those sums. No record or statement of the full amounts so handled was given. The brother did not testify or appear at the hearing. It is to be noted that the petitioner's 1945 return reports business profit of $25,366.47, approximating the amounts determined by the respondent as profits for 1943 and 1944. This return was made after an investigation of the 1943 and 1944 returns was commenced, and tends to corroborate the figures reached by the respondent. The petitioner explains that his business at the new location on Biscayne Boulevard was much improved and accounts for the difference. This return reports gross sales of about $282,000 as compared with about $174,000 for 1943 and $200,000 for 1944. This would mean that *287 the petitioner realized a profit of nine per cent of gross sales for 1945 as compared with a reported profit of less than four per cent in 1943 and less than three per cent for 1944, and casts some doubt upon this explanation. The petitioner argues that the amounts of unreported sales found by the respondent were only nine per cent in 1943 and six per cent in 1944 of the sales actually reported on the returns; and that these are not such substantial understatements as to constitute evidence of fraud, but are more consistent with innocent errors or mere inaccuracies. This argument attempts to disguise the effect of the discrepancies, for although a minor proportion of the gross sales, they almost entirely represent profit extracted and retained without disclosure, and over and above the profit reported on the returns. We are convinced that there were substantial understatements of the petitioner's income and that they were deliberate and with intent to evade tax. Decision will be entered for the respondent.